UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROOSEVELT VINES,

          Petitioner,

    v.

KEVIN HIXON, et al.,

          Respondents.

Case No. 23-cv-05765-AMO

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 1

Petitioner Roosevelt Vines is currently incarcerated at San Quentin State Prison. He alleges his confinement is unlawful under the United States Constitution and petitions this Court for a writ of habeas corpus. Having reviewed the parties' submissions, the relevant California appellate decision, and the trial transcript from the Alameda County Superior Court, the Court **DENIES** the petition for writ of habeas corpus.

**PROCEDURAL HISTORY**

On March 6, 2020, a jury in Alameda County convicted Vines of first-degree murder, unlawful possession of a firearm, and dissuading a witness from testifying. Dkt. No. 18-1 at 337-339. The trial court then sentenced Vines to "50 years to life, plus 3 years, 8 months, in state prison." *People v. Vines*, No. A160961, 2022 WL 1639368, at *3 (Cal. Ct. App. May 24, 2022). On May 24, 2022, the California Court of Appeal affirmed Vines's conviction on direct review. *Id.* at *1. Vines then filed a petition for review with the California Supreme Court, which was denied on August 10, 2022. Dkt. No. 18-8 at 57. Vines filed this petition for writ of habeas corpus on November 8, 2023. Dkt. No. 1.

United States District Court
Northern District of California

United States District Court
Northern District of California

# FACTS ESTABLISHED AT TRIAL

Facts drawn from the state appellate court's decision are presumed correct unless rebutted by clear and convincing evidence. *Moses v. Payne*, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (citing 28 U.S.C. § 2254(e)(1) and *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002)). Because Vines does not assert that the facts in the state appellate court's decision are erroneous, the Court relies on them. *See id.* The state appellate decision summarizes the facts as follows:

In August 2018, [Vines's] friend, Esau Davis, was killed in the 7100 block of International Boulevard in Oakland. [Vines] learned about the death the following day, and then went to a memorial spot near where Davis had been killed to try to find out what happened. He carried a gun "on the side of [his] pants."

Vines testified he encountered Thomas, also a friend, at the memorial spot. [Vines] asked Thomas " 'what happened yesterday with Esau.' " Thomas responded he did not know, but " 'word was Esau told on someone and that's what happened.' " Thomas told [Vines] to " 'be safe,' " and [Vines] responded he was " 'strapped.' " Thomas asked to see the gun. Vines had felony convictions and did not want to be seen with a gun. He knew there were surveillance cameras at that location, so he turned away from the cameras before he "pulled [the gun] out to show him." According to [Vines], he "pulled [the gun] out and the motherfucker just said pow. And then when it went off, I looked and I seen him drop. . . . [T]hat's when the panic and shit started happening, and I left." He testified he did not intend for the gun to go off.

[Vines] drove to his sister's house, changed his clothes, and disposed of his old clothing and the gun in three separate garbage bags. He then drove to the home of his girlfriend, J.W. He testified he was "hysterical," and told her he " 'accidentally shot my partna, [Thomas].' " J.W. told [Vines] to calm down and take a shower and brought him bleach to get rid of the gunshot residue. According to [Vines], the idea of using bleach to eliminate the gunshot residue was J.W.'s. He "wasn't even thinking about nothing like that really because [he] wasn't trying to hide or cover up."

Oakland police responded to the scene of the shooting after the "Shotspotter," which has microphone sensors that detect shots and calculates their geographic location, indicated a sound consistent with a single gunshot at about 3:43 p.m. near the 7100 block of International Boulevard in Oakland. When police arrived, they found a man, later identified as Thomas, next to a motorized wheelchair with a single gunshot wound to his head. He was pronounced dead at the scene.

Police obtained footage from multiple surveillance cameras near the time and place of the crime. The footage showed a man, later identified as [Vines], driving toward the crime scene in a Buick.

2

[Vines] parked the car, got out and headed towards Thomas who was sitting in a wheelchair on the other side of a fence. He stood next to Thomas for 90 to 100 seconds, then turned away from the main surveillance camera. The footage showed [Vines] quickly walking away before Thomas fell face forward to the ground. [Vines] then jogged back to the Buick and drove away.

Police began conducting surveillance on the Buick. After obtaining a warrant, police placed tracker devices on the Buick at traffic stops on September 5th and October 2nd. On October 6th, police stopped the Buick for a traffic violation and arrested [Vines], the driver, on an out-of-county arrest warrant.

Oakland Police conducted a videotaped interview of [Vines] almost two weeks later. [Vines] initially denied knowing anything about Thomas's shooting, denied knowing where he was killed, and denied talking to Thomas. After police showed him the surveillance video footage of the Buick at the scene, [Vines] admitted he was in the area and that Thomas and the wheelchair were there.

[Vines] told the police he had heard that someone tried to rob Davis and that Thomas might have witnessed Davis's murder. [Vines] admitted driving the Buick to the spot where Davis was murdered to figure out what happened to him. He never told the police he accidentally shot Thomas.

Police executed a search warrant at a home in Oakland where [Vines] stayed with his girlfriend, J.W. Her grandmother and a man named Jackie W. also lived there. Jackie W. told police J.W. told him [Vines] had " 'shot at somebody.' "

Police found indicia of ownership belonging to [Vines] in one bedroom, as well as nine-millimeter and .38-millimeter special ammunition, a box of .22 caliber ammunition and a .22 caliber firearm, and shotgun and rifle ammunition.

In May 2019, J.W. called police and said [Vines] shot Thomas. She left a voicemail for Sergeant Vass of the Oakland Police Department saying "this is pertaining to . . . Roosevelt Vines . . . Uh, he did it. . . August 27, it was a Monday. Early day. 2018. I might have a bullet . . . [B]ut his sister did something with the gun."

Sergeant Vass returned her call and told J.W. he would keep her name private. J.W. told Vass [Vines] came home on the day of the murder and changed his clothes. [Vines] told her he had gone to the area of Davis's murder in the Buick and spoke with a man who might have information about it. The man was "disrespectful," so [Vines] shot him once in the head with a nine-millimeter gun. After the shooting, he went to his sister's house and threw away his clothes and the gun. J.W. helped [Vines] shower and sprayed him with bleach to eliminate the gunshot residue. J.W. gave Sergeant Vass a bullet.

In October 2019, J.W. learned that [Vines] knew what she had told police. She called the prosecutor and identified herself as a witness. She said she had heard [Vines] knew she "snitched on him," "which

3

United States District Court
Northern District of California

shouldn't have never happened because [she] wanted to be anonymous." She indicated she now felt her "life [was] in danger."

J.W. testified under a grant of immunity and as a hostile witness. Although she acknowledged earlier telling the police her life was in danger, at trial she testified, "I wasn't afraid. There's nothing to be afraid about." She also testified she "fabricated a story" when she talked to Sergeant Vass because she wanted to get [Vines] in trouble. She was angry at him because he told her he wanted to move out of state with another woman and take the child he shared with J.W. [Vines] similarly testified that J.W. lied to the police about the shooting because she was angry with him because he cheated on her and was planning to take their baby and go to Las Vegas.

[Vines] and J.W. visited while he was in jail and talked by phone. Not all their conversations were recorded because they whispered or, on one occasion, [Vines] motioned to J.W. to put down the hand set which recorded jail conversations. During their conversations, [Vines] told J.W., " 'I'm not going to slaughter your name.' " He testified that meant "she did whatever she tried to do; like she tried to throw me under the bus. I would never do that to her . . . It's not worth it."

[Vines] explained the "code" in Oakland is "You snitch, you'll get killed or something." He told J.W. to admit she had lied about the case to police, and to speak with his defense attorney's investigator, which she ultimately did. [Vines] testified he "told her to . . . tell the truth, so she can tell what I really told her. Don't go and tell the police one thing and then turn around and just leave it like that."

*Vines*, 2022 WL 1639368, at *1-4. These facts serve as the background to Vines's three claims for habeas relief.

## LEGAL STANDARD

Pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a court may consider a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal habeas court cannot grant such a petition for any claim adjudicated on the merits in state court unless the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Vines's petition does not advance any arguments that the state court made an unreasonable determination

4

United States District Court
Northern District of California

of fact based on the evidence presented.  Thus, the Court considers the petition only under Section 2254(d)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  Ultimately, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Indeed, a petitioner "must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Review under Section 2254(d)(1) "requires federal courts to focu[s] on what a state court knew and did, and to measure state-court decisions against [the Supreme] Court's precedents *as of the time the state court renders its decision*." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (internal quotations omitted) (emphasis in original).  In addition, the federal habeas court must consider any arguments or theories that could have supported the state court's decision, rather than search out arguments against that decision. *See Sexton v. Beaudreaux*, 585 U.S. 961, 967-68 (2018).  This standard is "difficult to meet," since habeas relief exists only to "guard against extreme malfunctions in the state criminal justice systems." *Greene*, 565 U.S. at 43 (citations omitted).

## DISCUSSION

Vines argues that (1) there was insufficient evidence to support his conviction in violation of Vines's due process rights, (2) the prosecution's misconduct so infected the trial as to deprive Vines of due process, and (3) Vines's attorney was ineffective in violation of his Sixth Amendment rights.  The Court considers each argument in turn.

United States District Court
Northern District of California

## I.     Evidence of Premeditation and Deliberation

Vines asserts his first degree murder conviction violated his due process rights under the Fourteenth Amendment because the prosecution failed to present sufficient evidence of premeditation and deliberation.  Dkt. No. 1 at 30.  The state appellate court rejected this argument after reviewing the evidence and determining it was sufficient to support Vines's conviction.  *Vines*, 2022 WL 1639368, at *11-12.

The Supreme Court, in *Jackson v. Virginia*, established the standard for determining whether due process was upheld in reviewing the sufficiency of evidence to support a conviction.  443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original).  "Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution."  *Id.* (emphasis in original).  Further, the Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam).  These two layers of deference operate as follows:

> First, on direct appeal, "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.' "

*Id.* (internal citation omitted).  This standard does not permit "fine-grained factual parsing."  *Id.* at 655.  Rather, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality."  *Id.* at 656.

Although a "sufficiency of the evidence review is grounded in the Fourteenth Amendment," courts "undertake the inquiry with reference to the elements of the criminal offense

as set forth by state law." *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005), *amended*, No. 04-15562, 2005 WL 1653617 (9th Cir. July 8, 2005). Under California law, first degree murder is a "willful, deliberate and premeditated killing." Cal. Penal Code § 189(a). "Deliberation" refers to the careful weighing of considerations in forming a course of action, while "premeditation" means thought over in advance. *See People v. Koontz*, 27 Cal. 4th 1041, 1080 (2002).

Vines argues there is insufficient evidence that he acted with premeditation and deliberation. Dkt. No. 1 at 30. The Court disagrees. The trial record shows Vines arrived at the scene with a gun, entered and exited the scene through a hole in the fence, pointed the gun at Thomas's head after speaking with him briefly, and fled the scene quickly before Thomas fell to the ground. *Vines*, 2022 WL 1639368, at *12; Dkt No. 18-4, Reporter's Transcript ("RT") at RT 625-26. Further, J.W. told Sargeant Vass that Vines went to the area of Davis's murder to find out information about the shooting, and that he thought Anderson might have information on Davis's murder. *See* RT 552-53. J.W. additionally stated that Vines told her Anderson was disrespectful, so he shot him. RT 553. Thomas did not have a weapon on him. RT at 243.

Vines offers alternative explanations of the evidence presented at trial. For example, Vines argues that failing to conceal his identity, going to a place he frequented and would easily be recognized, driving his "distinctive" vehicle, and carrying his cell phone all show Vines did not plan to kill Thomas because "[n]o rational person would design a plot to commit murder which so obviously pointed to himself as the culprit." Dkt. No. 1 at 34-35. But if the facts support conflicting inferences, a habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. Moreover, the state court need not "rule out every hypothesis except that of guilt beyond a reasonable doubt at the first step of *Jackson*." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (citation and internal quotation marks omitted). The reviewing court must "respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Taylor*, 716 F.2d 701, 711 (9th Cir. 1983).

On this record, "after viewing the evidence in the light most favorable to the

United States District Court
Northern District of California

prosecution[,]" *Coleman*, 566 U.S. at 654, the Court cannot find that "no rational trier of fact could have agreed with the jury," *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). Nor can it conclude that the state court's decision to uphold Vines's first degree murder conviction was "objectively unreasonable." *Cavazos*, 565 U.S. at 2. Based on the evidence in the record, a reasonable jurist could find that a rational trier of fact concluded that Vines acted with premeditation and deliberation, as evidenced by the fact that Vines potentially tried to hide his identity by entering and exiting the scene through a hole in the fence, thought that Anderson had information on Thomas's murder, felt disrespected by Anderson, and shot Anderson after only speaking with him briefly. *See Vines*, 2022 WL 1639368, at *1-4; *People v. Solomon*, 49 Cal. 4th 792, 812 (2010) ("Premeditation and deliberation can occur in a brief interval") (quotations and citation omitted). Thus, the state appellate court's decision was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the Court denies habeas relief on this ground.

**II.     Prosecutorial Misconduct**

Next, Vines asserts that the prosecutor committed misconduct that deprived Vines of his Fourteenth Amendment due process rights. Prosecutorial misconduct violates a defendant's constitutional rights when it "infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Habeas relief is warranted only when the state court's rejection of the prosecutorial misconduct claim was an unreasonable application of the *Darden* standard, which is a general test that affords state courts broad leeway in its application. *Parker v. Matthews*, 567 U.S. 37, 45-47 (2012) (per curiam). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). To determine if the prosecutor's remarks so infected the trial with unfairness requires examining the entire proceeding. *See Johnson v. Sublett,* 63 F.3d 926, 929 (9th Cir. 1995).

Specifically, Vines argues that the prosecutor (1) repeatedly asked argumentative and objectionable questions during cross-examination, (2) interjected inappropriate remarks during

Vines's testimony, (3) asked Vines to comment on the testimony of another witness, (4) misstated the law during closing argument, (5) disparaged Vines and trial counsel, (6) misstated the evidence and argued facts not in evidence, and (7) presented arguments that infringed on Vines's attorney-client privilege. Dkt. No. 1 at 38-50. The state appellate court found that none of the prosecutor's actions constituted misconduct and that, even if they did, any asserted misconduct was not prejudicial. *Vines*, 2022 WL 1639368, at *11. The Court considers each of Vines's arguments in turn, and, finally, the prosecutorial misconduct as a whole.

### A. Cross-Examination of Vines

Vines contends the prosecutor committed misconduct in asking "argumentative and objectionable questions during cross-examination designed to prejudice the jury against" Vines. Dkt. No. 1 at 38. First, Vines takes issue with the prosecutor asking him, "you've been to prison?" RT 690. Vines's counsel objected, and the trial court sustained the objection. RT 690-91. The prosecutor rephrased the question and asked, "you don't want to go to prison now, right?" The trial court overruled counsel's objection to this question. RT 691.

Vines additionally challenges the prosecutor's cross-examination regarding the timeline of Davis's murder relative to Thomas's murder. Dkt. No. 1 at 38-39. The prosecutor asked Vines whether it was an everyday occurrence "where Esau Davis gets murdered and the very next day you kill one of your friends?" RT 763. Counsel objected to the question as argumentative, and the court sustained the objection. RT 763. The prosecutor then asked whether killing Thomas the day after Davis's murder would "stick out in your mind?" *Id.* The court sustained counsel's argumentative and relevance objections to that query. RT 763. The court then convened a sidebar during which it directed the prosecutor to "accept" its rulings and stated to the prosecutor, "you have a habit of commenting. That's not professional. It's a habit. I'd just ask you to stop it." RT 764.

Finally, the prosecutor twice asked Vines if his attempts to communicate with J.W. during jail visits without using the phone and his attempts at using coded language when speaking with his sister appeared to be "desperate acts" of a guilty man. RT 795-98. Both times, the trial court sustained counsel's "argumentative" and "relevance" objections. RT 797-98.

The state appellate court concluded that none of these actions constituted prosecutorial misconduct. For the questions regarding Vines's previous jail time and desire to avoid jail, the court found that "simply asking a question to which an objection is sustained, and following up with questions to which no objections are made, is not misconduct." *Vines*, 2022 WL 1639368, at *4. As for the questions regarding Vines's attempts to communicate with J.W. and his sister, the state appellate court found that "[t]he fact that the court sustained objections to these two questions does not mean asking them rose to the level of misconduct." *Id.* at *5. Further, the court cited to California Supreme Court precedent establishing that there was no basis for a claim of misconduct where, even assuming the prosecutor's questioning was hostile, repetitive, and argumentative, there was no line of questioning that "crossed over any boundaries of fair play or that would have led the jury to decide this case on anything other than the facts and the law." *Id.* (quoting *People v. Armstrong*, 6 Cal. 5th 735, 796 (2019)). Additionally, the trial court clearly instructed the jury that if it sustained an objection to a question posed by one of the attorneys, the jury was to ignore the question. Dkt. No. 18-1, Clerk's Transcript ("CT") 267. The jury is presumed to have followed the court's instruction. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). After reviewing the trial court record and the state appellate court's decision, the Court finds that the state court reasonably determined that the prosecutor's questions did not constitute misconduct and did not prejudice Vines, particularly because jurors were instructed to ignore questions when the trial court sustained an objection. Moreover, Vines has failed to advance any authority supporting that the state appellate court's finding was unreasonable. The Court must reject this as a basis for habeas relief.

### B. Inappropriate Remarks

Second, Vines contends the prosecutor committed misconduct by interjecting "sure" following Vines's answers during cross-examination. Dkt. No. 1 at 40. The record shows that on two occasions, after Vines answered a question, the prosecutor commented "sure" before moving on to her next question. RT 741, 744. Counsel objected, stating: "I would ask the Court to admonish counsel not to make snotty little remarks like 'sure' after a witness gives a response." RT 744. The trial court agreed, stating, "that's true. Counsel, please ask the questions. No

United States District Court
Northern District of California

comments." *Id.*

Vines asserts that this constituted misconduct because the prosecutor's comments invited the jury to rely on the government's view of the evidence or allowed them to avoid independently assessing credibility. Dkt. No. 1 at 41 (citing *People v. Bonilla*, 41 Cal. 4th 313, 336 (2007)). The state appellate court disagreed, stating, "[t]he prosecutor's two comments of 'sure' could not reasonably have been understood by jurors to permit them to avoid independently assessing defendant's credibility." *Vines*, 2022 WL 1639368, at *5. This Court agrees and finds that the state appellate court reasonably concluded that the prosecutor's remarks were not misconduct. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations."). Moreover, Vines cites no cases establishing that the state appellate court's conclusion was an unreasonable application of clearly established federal law. *See* Dkt. No. 1 at 41. Accordingly, the Court cannot find that the state court's determination that the prosecutor's comments were not misconduct was an unreasonable application of, or contrary to, clearly established federal law.

### C. Opinion On Testimony of Another Witness

Third, Vines avers the prosecutor committed misconduct by asking him to give an opinion on whether J.W. was being truthful in her testimony. Dkt. No. 1 at 41. The state appellate court accurately summarized the exchange:

> "Q: Would you agree that it appeared like she wasn't telling the whole truth? A: She wasn't telling the truth, no. Q: And would you agree with me it was obvious she wasn't telling the truth? A: I don't know what was going on with her. Like I said, you want me to say thing or do things that y'all already know. Like I don't know. Q: Would you agree with me that it was obvious that she wasn't telling the truth?" At this point, the trial court sustained defense counsel's asked and answered objection. The prosecutor again asked "As you sit there now, do you believe it was obvious she wasn't telling the truth?" The court sustained defense counsel's argumentative and asked and answered objections.

*Vines*, 2022 WL 1639368, at *5. The state appellate court found that these questions did not constitute misconduct because "[Vines] had already testified that J.W. was lying before the

11

United States District Court
Northern District of California

prosecutor asked the challenged questions." *Id.* at *6. Indeed, California Supreme Court precedent establishes as much. *People v. Riggs*, 44 Cal. 4th 248, 318 (2008) (finding that "were they lying" questions from prosecutor were not improper where "defendant, who had personal knowledge of whether he abused these women in the manner to which they testified, opened the door to the prosecutor's questions by testifying in his direct examination that these witnesses were untruthful.").

Vines contends that "[t]he Ninth Circuit has held such questioning is misconduct because whether a witness is testifying truthfully is a question for the jury." Dkt. No. 1 at 42 (citing *United States v. Sanchez*, 176 F.3d 1214, 1219 (9th Cir. 1999)). As an initial matter, *Sanchez* was not a habeas case; it was a direct appeal. *Id.* at 1216. Accordingly, *Sanchez* cannot aid this Court's review of whether the state appellate court misapplied *Darden*. In any event, the *Sanchez* court held specifically that it constituted misconduct for a prosecutor to ask a defendant whether a law enforcement officer was lying, a circumstance distinguishable from the facts of this case. *See id.* at 1219-20. Vines provides the Court no authority to support his proposition that the state appellate court misapplied *Darden* in finding that the prosecutor did not commit misconduct when asking Vines whether a layperson was lying after he previously opined on that very issue. Thus, the Court cannot find that the state appellate court's rejection of this claim was an unreasonable application of, or contrary to, clearly established federal law.

### D. Misstating the Law

Fourth, Vines contends the prosecutor "repeatedly misstated [state] law during closing argument," specifically as to accidental shooting, dissuading a witness, and implied malice. Dkt. No. 1 at 42-46. The state appellate court concluded the prosecutor did not misstate state law. *Vines*, 2022 WL 1639368, at *6-9. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 71-72 (1991) (finding that argument that jury instruction was allegedly incorrect under state law was not a basis for habeas relief). Thus, the question before the Court is not whether the prosecution misstated the law, but rather whether the

12

United States District Court
Northern District of California

alleged misstatement "so infused the trial with unfairness as to deny due process of the law." *Id.* at 75 (internal quotations omitted). Vines provides no support for the contention that the alleged misstatements violated his due process rights. Dkt. No. 1 at 42-46. In fact, he does not cite a single federal case in arguing that this conduct violated his constitutional rights. *Id.* Instead, he spends four pages arguing that the prosecutor misstated state law. *Id.* Because it is not the purview of this Court to re-examine the state appellate court's determination that the prosecutor misstated the law, and because Vines raises no authorities which suggest that the alleged misstatements violated his clearly established due process rights, the Court cannot rule in Vines's favor on this claim.

### E. Disparaging Vines and Trial Counsel

Fifth, Vines contends the prosecutor disparaged Vines and trial counsel by commenting that Vines "arrogantly pointed out that the ballistics were inconclusive" and by commenting during rebuttal closing that "one of my favorite things is when privileged grown men tell me my thought process." Dkt. No. 1 at 47. In an evaluation of whether a prosecutor's "undesirable or even universally condemned" remarks constituted misconduct, "the relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden*, 477 U.S. at 181.

The state court's determination that the prosecutor's comments did not constitute misconduct was not contrary to, or an unreasonable application of, clearly established federal law. In *Darden*, the Supreme Court held that a prosecutor did not violate a defendant's due process rights by describing him as an "animal" who should not be released from his cell without a "leash." 477 U.S. at 180-81; *see also Runningeagle v. Ryan*, 686 F.3d 758, 780-82 (9th Cir. 2012) (concluding no due process violation where prosecutor described crime as "unspeakable horror" and defendant as "the evil . . . among us," where court instructed jury that attorneys' arguments were not evidence, and the evidence of guilt was substantial). The prosecutor's statements here are far less inflammatory than in *Darden* and *Runningeagle*, both cases where the Supreme Court denied writs of habeas corpus. Accordingly, Vines has not established the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.

13

**F.   Misstating Evidence and Arguing Facts Not In Evidence**

Sixth, Vines argues the prosecutor committed misconduct by using a visual aid during closing argument – two bags of sugar – and arguing the force required to lift either two bags of sugar or one gallon of milk approximated the force necessary to pull the trigger on a firearm because the prosecutor's argument was unsupported by evidence.  Dkt. No. 1 at 48-49.

Vines takes issue with the prosecutor's comparison of the weight of the sugar to a gallon of milk because "[t]here was no evidence as to the weight of a gallon of milk."  Dkt. No. 1 at 48.  As the state court noted, a criminalist testified that the gun used to kill Thomas required a seven- to ten-pound trigger pull.  *Vines*, 2022 WL 1639368, at *9.  The criminalist explained that this was like "hanging up to two bags of sugar on that trigger before it will pull."  RT 816-17.

Here, the state appellate court's rejection of this claim was not contrary to or an unreasonable application of *Darden*.  The state appellate court recognized that a prosecutor commits misconduct in closing argument by stating facts that are not in evidence, *Vines*, 2022 WL 1639368, at *9 (citing *People v. Rivera*, 7 Cal. 5th 306, 335 (2019)), but that a prosecutor is given wide latitude in presenting argument, which includes reasonable inferences and deductions from the evidence, *People v. Hill*, 17 Cal. 4th 800, 819 (1998).  The court also noted that a prosecutor is entitled to refer to matters that are common knowledge or based on common experience.  *Id.*  It concluded "the prosecutor's reference to a gallon of milk being about the same weight as a bag of sugar certainly referred to a matter of common knowledge.  In any case, the passing reference to the weight of a gallon of milk was harmless."  *Vines*, 2022 WL 1639368, at *9.  This Court agrees that the prosecutor's remarks during closing were not improper, and that even if they were the trial court instructed jurors that "[n]othing the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."  CT 267.  Because the remarks were not improper, the state appellate court did not unreasonably apply *Darden*.

**G.   Infringing on Vines's Attorney-Client Privilege**

Lastly, Vines contends the prosecutor infringed on his attorney-client privilege.  Dkt. No. 1 at 49-50.  He cites the prosecutor's rebuttal argument, in which she commented that Vines "didn't

14

United States District Court
Northern District of California

say he ever heard anything about an accident" because he "hadn't come up with that lie yet because it wasn't an accident, and neither lawyer even knew to ask it." *Id.* at 49.  He also cites the prosecutor's rhetorical question: "Did you once hear the defendant even say, quote, 'I told my lawyer it was an accident?'  No." *Id.*  The state appellate court found that this did not constitute misconduct because the prosecutor was responding to defense counsel's argument that Vines had told him from "day one" that the shooting was an accident. *Vines*, 2022 WL 1639368, at \*10.  According to the state appellate court, the prosecutor correctly pointed out, in response to defense counsel's argument, that Vines did not testify that he told his attorney the shooting was an accident. *Id.*  Again, Vines provides the Court with no authority establishing that this conduct constituted misconduct or violated Vines's due process rights.  Thus, the Court cannot find that the state appellate court's decision was contrary to or an unreasonable application of *Darden*.

In sum, Vines has not shown that the prosecutor's behavior, whether considered individually or in the aggregate, so infected the trial with unfairness as to make the resulting conviction a denial of due process.  He also has not shown that the state court's decision was contrary to, or an unreasonable application of, clearly established federal law.  Thus, Vines is not entitled to relief on his prosecutorial misconduct claim.

### III.    Ineffective Assistance of Counsel

Finally, Vines contends that his trial counsel was ineffective in violation of Vines's Sixth Amendment rights because he failed to object to some instances of alleged prosecutorial misconduct, all of which are described in the preceding section.  Dkt. No. 1 at 37.  The state appellate court did not reach this argument because it determined that the prosecutor had not committed misconduct and that any alleged misconduct was not prejudicial. *See Vines*, 2022 WL 1639368, at \*11, n.9 ("We therefore need not, and do not, reach defendant's claim that his counsel was ineffective in failing to object to the asserted instances of misconduct.").  Because the state court did not reach the merits of Vines's ineffective assistance of counsel claim, federal habeas review of this claim is de novo. *Cone v. Bell*, 556 U.S. 449, 472 (2009).

To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's conduct fell below an objective standard of reasonableness, and that the defendant was

15

prejudiced by counsel's acts or omissions. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Thus, a reviewing court is "required not simply to 'give [the] attorneys the benefit of the doubt,' but to affirmatively entertain the range of possible 'reasons [] counsel may have had for proceeding as they did.'" *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (citations omitted).

Here, trial counsel's failure to object may have resulted because he found the prosecutor's conduct unobjectionable, which was not unreasonable, as evidenced by the state appellate court's finding that the prosecutor's actions did not constitute misconduct. Therefore, Vines is not entitled to relief on his ineffective assistance of counsel claim. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) ("trial counsel cannot have been ineffective for failing to raise a meritless objection"); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance").

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June 29, 2026

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California